UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARBER CONSULTANTS, LLC,<br><br>*Plaintiff,*<br><br>-against-<br><br>G.O.A.T PRODUCTS LLC and MICHELLE WINOWICH,<br><br>*Defendant.* | Case No. 22-cv-6045<br><br>ECF Case<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Charber Consultants, LLC ("Charber" or "Plaintiff"), through its undersigned attorneys, Yifat V. Schnur, Esq., for his Complaint against Defendants G.O.A.T Products LLC ("GOAT") and Michelle Winowich ("Winowich" and, with GOAT, "Defendants") alleges as follows:

**NATURE OF ACTION**

1.      This is an action for breach of contract and fraudulent inducement arising out of Charber's agreement to purchase COVID-19 rapid antigen tests (the "Tests') from Defendant GOAT, a company solely owned and operated by Michelle Winowich.

2.      Charber, whose principal is Charles Berger ("Berger"), is in the business of buying and selling Personal Protective Equipment ("PPE") related to the COVID-19 Pandemic

3.      In early February 2022, Charber received inquiries regarding the availability for purchase of a large number of COVID-19 tests, and Charber had at least one prospective buyer who was willing to pay Charber $16.25 per test kit if Charber could deliver the testing kits promptly. To make this sale, Charber needed to purchase COVID-19 tests that would ship no later than February 7, 2022.

4.      Accordingly, Charber entered the marketplace, through a broker, and was connected with Winowich and GOAT, who claimed to have tests for sale that could be shipped

no later than February 7th.  Charber and GOAT had repeated conversations, by telephone and, text, in which Winowich, on behalf of GOAT, represented to Berger, on behalf of Charber, that GOAT could ship the Tests on time.  These conversations occurred directly between Winowich and Berger, between Winowich, Berger and the broker, and between Berger and the broker, who was acting as Winowich's agent.

5. Charber agreed to purchase the Tests from GOAT.  However, before wiring the Funds, Charber demanded GOAT amend its standard invoice to include a statement that if the tests did not ship by February 7th, then Charber would be entitled to a full refund.  GOAT agreed, and on February 2nd sent an invoice, which stated if the Tests were not "schedule to ship by 2/7," then Charber would be entitled to a full refund.

6. In reliance on Defendants' representations and the invoice's provision requiring the Tests to be shipped by February 7th, on February 2nd, Charber wired $1,292,760 to GOAT.

7. During the next several days, Winowich repeatedly assured Charber that the Tests would be shipped no later than February 7th.

8. However, February 7th came and went, and GOAT failed to ship the Tests on time.  Accordingly, immediately after the warehouse, which Charber secured to accept the goods, closed on February 7th, Berger informed GOAT that, pursuant to the terms of the parties' agreement, Charber was demanding a full refund.

9. While, in the subsequent days and weeks, Defendants repeatedly delayed in refunding Charber in full, setting forth various excuses and attempting to convince Charber to accept the Tests notwithstanding GOAT's breach, **not once did GOAT or Winowich ever state that Charber was not entitled to a refund**.

10. Instead, GOAT in fact refunded Charber $951,095.00, leaving a balance of $341,665 outstanding. Charber thus brings this action to collect the remaining $341,665, as well as consequential damages caused by GOAT's breach.

11. Charber would not have agreed to purchase the Tests from GOAT but for Defendants' representations Defendant could ship the tests by February 7th, and specifically demanded contractual language providing Charber with the right to a refund if the Tests did not ship by February 7th. Accordingly, whether by breach of contract or fraudulent inducement, Defendants' wrongful conduct has damaged Charber, not only in the amount of $341,665, the difference between what Charber paid to GOAT and the amount GOAT has refunded to date, but also consequential damages including attorneys' fees, lost profits, and lost future business caused by Defendants' wrongful conduct.

## THE PARTIES

12. Plaintiff Charber Consultants LLC is a New York Limited Liability Company with its principal place of business located at 8 Jade Court, Pomona, NY 10970

13. Defendant G.O.A.T. Products LLC is a Michigan Limited Liability Company. Upon information and belief, GOAT's principal place of business is located at 7435 Saint Auburn Drive, Bloomfield Hills, MI 48301.

14. Defendant Michelle Winowich is an individual and a Michigan citizen, resident and domiciliary.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the Plaintiff is a citizen of New York, and the Defendants are citizens of Michigan.

16. Venue is proper in this jurisdiction as Plaintiff is a New York LLC with its principal place of business located in Rockland County, New York. Further, Defendants contracted to sell the Tests to Plaintiff at 8 Jade Court, Pomona, NY 10970, and thus this is the venue in which substantial part of the events giving rise to the claims occurred. 28 U.S.C. § 1332. Defendants intentionally and consistently directed their business to New York in order to complete the sale of the Tests to Charber, a New York entity.

## BACKGROUND

### A.    Charber is Introduced to Defendants Through a Broker

17. The market for COVID-19 tests is filled with many individuals and entities constantly buying and selling tests. Accordingly, individuals known as brokers have developed businesses over the past two years in connecting individuals selling COVID-19 tests with individuals or entities looking to purchase them.

18. In or around late January 2022, Charber received inquiries from a past customer regarding the availability for purchase of COVID-19 tests, at a price of $16.25. This transaction would be finalized when Charber had actual possession of a bill of lading. The potential buyer made clear that time was of the essence, and needed the tests promptly, such that Charber would only be able to fulfil the order if he was able to purchase tests that would ship on or before February 7, 2022.

19. Accordingly, Charber engaged in conversation with brokers who represented knowing of sellers who had access to a sufficient number of COVID-19 tests available to sell and, with the ability to deliver those tests on or before February 7, as was necessary in order for Charber to secure the transaction.

20. In or around February 1, 2022, Charber was connected by a broker with Defendants, who represented they could sell to Charber at least 90,720 2-box COVID-19 antigen tests at a price of $14.25 per box. Given the $16.25 offer that Charber had from its buyer, this meant that Charber would make $2.00 per box, or a total profit of $181,440.

21. Defendants originally represented that they could sell 120,960 tests (16 pallets), but then later claimed that only 90,720 boxes (12 pallets) were available due to Charber's delay in agreeing to purchase them. In light of subsequent events, Charber seriously doubts whether this was ever true or merely a ploy to induce Charber to act quickly in securing the "remaining" tests.

### B. Defendants Repeatedly Represent They Can Ship By February 7th and the Parties Enter into an Agreement.

22. From the first instance of their communications, both directly and through the broker, Charber's principal, Charles Berger, made clear to Winowich and GOAT time was of the essence.

23. Specifically, Charber repeatedly informed Defendants it was only willing to purchase the Tests if same could be shipped on or before February 7, 2022.

24. **Before Charber ever agreed to the purchase and wired funds,** Winowich, acting as the principal of GOAT, repeatedly represented to Charber Defendants would be able to ship the Tests to Plaintiff on or before February 7. This included conversations and messages both directly between Winowich and Berger, as well as communications through the broker, who was working as an agent to Defendants.

   a. On February 1, 2022, at Charber's request, the broker repeatedly spoke to Winowich on the phone, including but not limited to calls at 11:42AM; 12:00PM; 12:17PM; 12:20 PM; 12:50PM; 1:41PM; 2:24PM; 2:48PM;

5

       301PM: 303:PM; 3:57PM and 4:52PM. On these calls, Winowich repeatedly stated to the broker that the Tests were secured and could be shipped out no later than Monday February 7, 2022. Winowich made these representations to the broker with the understanding and intention that they would be passed on to Charber in order to induce Charber to agree to purchase the Tests from Defendants. Consistent with this understanding, before, during and after these calls between Winowich and the broker, the broker was contemporaneously speaking with Berger telephonically to share Winowich's representations with Berger, including but not limited to calls between Berger and the broker at 2:16 PM, 2:30PM, 2:47PM, 2:57PM, 3:00PM, 3:22PM, 3:32PM, 3:34PM, 3:40PM, 3:50PM, 4:21 PM, 4:30PM, 6:14PM, 6:18PM, 6:40PM, 6:43PM, 6:51PM and 9:28PM.

    b. Defendants also represented the supplier of the goods whom Defendants secured the Tests from had guaranteed a refund so that Plaintiff was more likely to reply on Defendants' representation a refund would not be a problem if the goods did not ship out on time.

25.     It was for this reason that, before Plaintiff agreed to make a wire transfer to purchase the Tests, Charber insisted on the guarantee Defendants had articulated regarding the shipping time be memorialized in the invoice from GOAT, which represented the parties' agreement, stating if the goods were not shipped on or before February 7, 2022, then Charber had the right to a complete refund from GOAT. Plaintiff would not have agreed to purchase the Tests without this guarantee from Defendants; specifically Plaintiff would not have agreed to

6

purchase the Tests from Defendants without being given, in writing, the guarantee that the entire purchase would be refunded if the Tests were not shipped on or before February 7, 2022.

26. On February 2, Defendants demanded Charber wire the funds necessary to purchase the Tests in order to ensure the goods shipped out no later than February 7th.

27. At 1:25 PM on February 2, Charber received, from the broker, a copy of the invoice from GOAT. The invoice was mistakenly dated February 2, *2021*, but was agreed to on February 2, 2022. The invoice set forth the quantity of Tests, 90,720 2-test boxes, the agreed-upon cost, $14.25 per box, and the total cost, $1,292,760.00. Further, the invoice included the statement, at the bottom, "If product is not scheduled to ship by Monday 2/7/2022 customer will have the option for a refund." **Exhibit 1.** This statement was **not** standard in Defendants' invoices, but was specifically added at Charber's demand to indicate time was of the essence for this transaction.

28. Charber immediately informed the broker the invoice should provide Charber would be entitled to a refund "if product doesn't ship by 2/7," in order to avoid confusion over the unclear term "scheduled to ship by Monday 2/7/2022." The broker responded he was "on it." Shortly after these messages with the broker, Charles Berger, on behalf of Charber, had a telephone conversation between Winowich, on behalf of GOAT. This conversation occurred between approximately 1:25 PM and 2:39 PM on February 2. During this conversation, Winowich represented the Tests could likely ship on Friday, February 4, but would absolutely ship no later than Monday, February 7, and thus confirmed her understanding that the term on the invoice that the Tests must be "scheduled to ship by 2/7" meant that they must actually be shipped by 2/7. However, Winowich made clear she could only promise this shipping time if Charber **immediately** wired the entire amount of the purchase, or $1,292,760.

7

29.     In reliance on Winowich's representation the products would be shipped no later than February 7 so long as the funds were wired that day, shortly after this conversation, on February 2, 2022, Charber wired the amount of $1,292,760.00 to GOAT to purchase the products.

30.     At 2:39 on February 2, the broker created a three-person text message group "so we can all be transparent."  In that group chat, Winowich repeatedly pressed Berger for the wire information, and Berger informed Winowich the wire transaction had been initiated "32 minutes ago."

31.     Winowich subsequently confirmed receipt of the funds from Charber, and told Charber she was "on to full go on shipping them out.  I will keep you updated every step of the way.  I won't let you down!!!!"

32.     The following day, Thursday, February 3, Winowich wrote to Berger and the broker with an update, confirming the discussion between Berger and Winowich on February 2, stating the Tests would be shipped , "like I said Monday [February 7]", but noting "I'm still pushing now like a mad woman for tomorrow [Friday February 4, 2022]."  Winowich later added "I have in writing from supplier than everything is on schedule to ship Monday.  I am still pushing for tomorrow."  And later the same date, Winowich added," I don't have confirmation on tomorrow.  So far only Monday but I'm giving it all I got."  During these discussions, Berger informed Winowich the delivery was being changed from a warehouse in New York to a warehouse in California, which is where the Tests were supposed to ship from, making it easier for Charber to receive the Tests the same day they were shipped.  Winowich confirmed this new address.

33.     At 4:40 pm on February 4, , Winowich wrote the shipping was "not happening today but it is confirmed for Monday."  Berger responded, informing Winowich, the warehouse in California closes at 3pm Pacific time on Fridays and would be closed over the weekend.  Berger also advised the warehouse closes at 5:00 PM PT on weekdays, including February 7th.

34.     On Sunday, February 6, Winowich wrote "the last update I received was yesterday that everything is on schedule."

        **C.**     **Defendants Breach the Parties' Agreement**

35.     Winowich texted Berger and the broker at 10:29AM ET on Monday, February 7th, "Todays the big day.  I have been in constant contact with all involved to ensure shipping goes smooth as silk today.  So far all is as planned . . . ."

36.     The next message from Winowich was not until over seven hours later at 5:40PM ET, when Winowich wrote she was "getting the [Bill of Landing] any second" and asked for the phone number and contact information to the warehouse for delivery.  When Berger asked Winowich if that meant it was "shipping as we speak," Winowich responded, "I know it's on a truck but without the BOL I don't know if it left yet and/or it's going straight to you.  It's going today but I'm still working on exact timing."  Berger responded, "We need the products today otherwise we will need a refund."  Winowich responded, "I'm working like a mad woman and making it happen."

37.     At approximately 7:10PM ET, Berger, the Broker and Winowich spoke by telephone.  During that call, Winowich admitted that she would not be able to deliver all of the Tests that day, and asked if Berger would accept a partial shipment.  Berger declined.

38.     At 7:42PM ET, Berger wrote to Winowich asking where the Tests were, as "they officially close in 18 mins."  After 8:00PM ET, 5:00PM Pacific, Berger informed Winowich,

9

"Warehouse is closed for the day. As per our agreement I'm requesting a refund for the [Order]. I'll send the wire info shortly and expect a wire by mid-day tomorrow."

### D. Defendants Admit Their Breach and Refund a Portion of the Funds

39. Defendants initially conceded they were required to provide Charber with a complete refund. Defendants specifically told Charber they had the ability to, and would, demand a refund from the seller from whom GOAT had purchased the Tests. Defendants made this representation to Charber both before Charber agreed to purchase the Tests after the purchase order was agreed to, and after Charber demanded a refund when the shipping deadline was missed.

40. Without this representation, Charber would not have agreed to purchase the Tests. Specifically, Charber would not have agreed to purchase the Tests if Charber had known that Defendants' ability to refund the cost of the Tests to Charber depended on their ability to re-sell the Tests, as opposed to Defendants' right and ability to get a complete refund from Defendants' seller which would be passed on to Charber.

41. Initially, Winowich informed Berger the refund would be in his account no later than three business days. However, Defendants repeatedly changed their representation as to when the refund would be sent, causing Charber to engage an attorney to contact Defendants.

42. It soon became apparent that, contrary to their representations, Defendants did not, in fact, have the right or ability to get a complete refund from their seller. Instead, Defendants suddenly began to tell Charber that they could not refund the full amount he had wired to Defendants unless and until Defendants resold the Tests on the market. This was the first time that Charber was told that there would be any difficulty in Defendants refunded the

entire amount of his wire, as Defendants were contractually required to do, and as Defendants had repeatedly represented they could and would do.

43. After multiple conversations, by telephone, text and e-mail, between Winowich and Charber's counsel, finally, on Friday, 2/11/22, GOAT wired a partial refund to Charber, in the amount of $951,095.00  GOAT's explanation for why it was wiring only this amount, and not the full amount of $1,292,760.00, regularly changed, from claiming GOAT simply could not send a wire of over $1 million, to later claiming GOAT did not have the difference of $341,665, and would not have it until it sold the remaining pallets of Tests. Moreover, Winowich claimed she sold nine pallets (68,040 kits) which came out to $13.97 per kit and later stated she actually sold 10 pallets (75,600 kits) which is $12.58 per kit in order to mitigate her damages. These statements are also in direct contradiction with Winowich's representation the supplier had promised a full refund.  In other words, Winowich was making it up on the fly, and was never honest with Charber or its counsel.

44. Further during the conversations between Winowich and Charber's counsel, Winowich, admitted they had been waiting for the Tests to be released from GOAT's supplier since December 2021.  Thus, GOAT and Winowich knew, when they represented to Charber the Tests could be shipped no later than February 7, it was highly unlikely, if not impossible, that this was true.  However, Defendants made these representations in order to induce Charber into wiring the funds. Indeed, Winowich repeatedly represented not only that they Tests would be shipped by Monday the 7th, but that she was "pushing for" them to be shipped by February 4th. This was all a sham. As Winowich's admissions that she had been waiting for the Tests to be released since December 2021 makes clear, **there was never any possibility that the Tests would be shipped by 2/7, let alone 2/4.**  This was all a fraud on Plaintiff made in order to

induce Plaintiff to agree to purchase the Tests, thus putting all of the risk on Plaintiff instead of Defendants.

45. Moreover, upon information and belief, Defendants' subsequent conduct regarding the Tests makes clear that Defendants never had possession of the Tests. Specifically, on or around February 7 and 8, 2022, after Charber had demanded a refund, Defendants attempted to sell the Tests, through the same broker, to a different party. When that party demanded the currently location of the Tests in order to inspect them, a common practice in the industry, Defendants repeatedly delayed. Then, after finally provided an address where Defendants claimed the Tests were located, Defendants refused to permit the potential buyer to enter the warehouse to inspect  This shows that Defendants never had possession of the Tests, as they had represented to Charber previously.

46. After many days of GOAT promising, but failing, to provide the remaining refund, GOAT hired legal counsel, who changed GOAT's story. Despite GOAT and Winowich's prior admissions they were required to refund Charber in its entirety, Defendants' new position was the statement on the invoice requiring the Tests to be "scheduled to ship" by February 7 meant only that, on or before February 7, GOAT had to provide evidence it had a scheduled shipping date for the Tests, which could be **any date in the future**. Of course, it belies logic Charber would have agreed to a term giving GOAT carte blanche to ship the Tests whenever it wanted, so long as it scheduled the date on or before February 7.

47. According to Defendants' new position, despite Defendants' admission the Tests were never able to be shipped on or before February 7, GOAT fulfilled its portion of the contract because, on February 7, it scheduled the Tests to ship at a later date. According to Defendants, Charber thus breached the parties' agreement when it declined shipment of the Tests after

February 7.  Defendants thus claim they were entitled, under the UCC, to re-sell the Tests and reimburse Charber only for the amount Defendants obtained through this re-sale.

48. This reading of the parties' agreement belies the plain meaning of "scheduled to ship by."  Moreover, if that term is ambiguous, then the parties' contemporaneous discussions make clear both sides understood this meant that the products **must actually ship** by February 7. Indeed, in a text message sent on the morning of February 7, Winowich called February 7th "the big day," and ensured Berger "all is as planned," meaning the Tests would ship that day.

49. In the alternative, if the parties' agreement is found not to require shipping by February 7, but rather that shipping was required to be scheduled by February 7th, then Winowich fraudulently induced Charber to purchase the Tests.  Winowich repeatedly represented to Charber that GOAT could, without any doubt, ship the Tests by February 7th. Charber consistently made clear that it needed the products to **ship on February** 7th, and Defendants repeatedly represented they would meet this deadline.  It was on the basis of these representations that Charber agreed to purchase the Tests and wire the funds, and Charber would never have agreed to purchase the Tests but for these representations.

50. As a result of Defendants' failure to ship the Tests by February 7th, Charber lost not only the $341,665 it paid to GOAT which was not refunded, but also lost the profits on its sale to Charber's own buyer of $181,440, as well as losing the buyer for any future deals, as they refuse to do business with those who cannot deliver the products on time.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Contract Against GOAT)

51. Plaintiff repeats and realleges each of the prior allegations of the Complaint as if fully set forth herein.

52. Charber and GOAT entered into an agreement for Charber to purchase 90,720 2-test boxes, at an agreed-upon cost, $14.25 per box, for a total of $1,292,760.00.

53. GOAT's offer was memorialized by the February 2, 2022 invoice. This invoice included the statement added at Plaintiff's request, "If product is not scheduled to ship by Monday 2/7/2022 customer will have the option for a refund." **Exhibit 1.**

54. The statement requiring the product be "scheduled to ship by Monday 2/7/2022," by its plain meaning, means the product must have a scheduled shipping date on or before Monday, February 7, not that it could be scheduled on February 7 for any date in the future.

55. Further, by telephone call on February 2nd, Winowich confirmed her understanding that this language meant the Tests must be shipped by February 7th.

56. Charber accepted GOAT's offer, as set forth in the February 2 invoice and in the parties' discussions in which Winowich confirmed that the Tests would be shipped no later than February 7, by wiring of $1,292,760.00 to GOAT on February 2, 2022.

57. GOAT breached the agreement by failing to ship the Tests on or before February 7, 2022.

58. GOAT subsequently ratified the parties' agreement and admitted its breach by refunding a portion of the $1,292,760 paid by Charber. Further GOAT has admitted, in text messages and e-mails on February 8, 2022, it had the ability to obtain a complete refund from the company from which it purchased the Tests. To the extent GOAT argues Charber breached the parties' agreement and it thus had the right to mitigate its damages by re-selling the Tests, GOAT was obligated to seek a full refund from its seller and thus could have refunded Charber the entire $1,292,760. Instead, GOAT chose to keep the Tests and attempted to resell them, hoping to make an even larger profit. GOAT's failure to seek a refund from its seller was a

14

further breach of the parties' agreement and/or GOAT's duties under that agreement to mitigate its damages. Significantly, as stated above, Winowich also represented to Charber, Winowich had in fact sold back the pallets to the original supplier.

59. As a result of GOAT's breach, Charber suffered out of pocket damages of $341,665, or the difference between $1,292,760, and the $951,095 GOAT refunded to Charber. Further, Charber was damaged by the loss of profits on its sale to its buyer, in the amount of $181,440, as well as losing the buyer as a potential customer in perpetuity, as the buyer subsequently refused to do business with Charber as a result of Charber's inability to provide the Tests to its buyer as previously agreed upon. Charber was further damages by incurring attorneys' fees necessary to collect its refund.

60. Charber is entitled to compensatory and consequential damages in an amount to be determined at trial, but which exceed $523,105, plus pre and post-judgment interest.

## **SECOND CAUSE OF ACTION**
### **(Actual and Constructive Fraud Against All Defendants)**

61. Plaintiff repeats and realleges each of the prior allegations of the Complaint as if fully set forth herein.

62. On multiple dates, including but not limited to by telephone conversations between Winowich and the broker and then the broker to Charber on February 1, 2022, and at least one telephonic conversation directly between Charber and Winowich on February 2, 2022, Defendants affirmatively misrepresented they had possession of the Tests and had the ability to ship the Tests to Charber on or before February 7, 2022.

63. Defendants further represented that they had the right to a full refund from their supplier should the Tests fail to ship by February 7, which refund could immediately be passed on to Charber should Charber demand a refund under the terms of the parties' agreement.

64. Winowich's misrepresentations and non-disclosures were made on behalf of GOAT.

65. Defendants knew their representations that their ability to ship the Tests by February 7, and the ability to demand a full refund from their supplier should the tests fail to ship by that date, were false, and intended Charber to rely on them. Defendants knew that Charber would not agree to purchase the Tests unless Defendants made the false representation that they could ship those tests by February 7th and, if they did not ship by that date, that Defendants would receive a full refund from their supplier which would be passed on to Charber.

66. Charber justifiably relied on Defendants' misrepresentations and would not have entered into an agreement with GOAT to purchase the Tests, and would not have wired the amount of $1,292,760.00 to GOAT on February 2, but for these misrepresentations.

67. **Defendants are jointly and severally liable for each other's fraud.**

68. **As a result of Defendants' fraud, Charber was unable to consummate the transaction with its potential buyer.**

69. As a result of GOAT's breach, Charber suffered out of pocket damages of $341,665, or the difference between $1,292,760, and the $951,095 GOAT refunded to Charber. Further, Charber was damaged by the loss of profits on its sale to its buyer, in the amount of $181,440, as well as losing the buyer as a potential customer in perpetuity, as the buyer subsequently refused to do business with Charber as a result of Charber's inability to provide the Tests to its buyer as previously agreed upon. Charber was further damages by incurring attorneys' fees necessary to collect its refund.

70. Charber is entitled to compensatory and consequential damages in an amount to be determined at trial, but which exceeds $523,105, plus pre and post-judgment interest.

**WHEREFORE,** Plaintiff demands a judgment in his favor on each of the causes of action stated above, and against Defendants for compensatory and consequential in an amount to be determined at trial, but which exceeds $523,105, plus pre- and post-judgment interest, plus its reasonable attorneys' fees and costs, specific performance, and such other relief as to the Court seems fair and appropriate.

Dated: New York, New York
       July 15, 2022

**YIFAT V. SCHNUR ESQ., LLC**

By: __/s/____
Yifat V. Schnur
22 Prescott Street
Edison, NJ 08817
Telephone: (347) 268-5347
**Email:  yifat@yvslaw.com**